The first case this morning is 0750255031, Yankee Atomic Electric Company v. United States. Mr. Lister. Thank you, Your Honor. May it please the Court. The trial court's decision here is one that is in direct conflict with another case that this court will hear today, the Pacific Gas and Electric decision. The two cannot be reconciled, and it is the Pacific Gas and Electric analysis of how to determine causation in these cases that is the rational analysis that complies with this court's precedence with regard to causation analyses. The trial court in this particular case on Joint Appendix Pages 15 and 16 discussed how initially when this case was tried, the case was in fact tried as though with the kind of analysis that Judge Hewitt and PG&E applied, that is, identifying what the government's contract obligations were, then identifying whether had DOE actually performed those obligations, what cost the utility would have incurred regardless of any breach, and then identifying what cost the utility actually incurred and deducting from the damages award any cost that in fact would have been incurred absent the government's breach of its actual contract obligations. The trial court in this case said that this court's decision in Indiana, Michigan, quote, altered the landscape and changed it into essentially a review of mitigation and whether the mitigation that the utility engaged in was reasonable or not. And for the reasons that we discuss in our brief, that analysis misses the actual causation analysis. We jump over that. The trial court here specifically found that regardless of the rate of acceptance, which is one of the central factors towards any causation analysis in this case, the government's delay was going to be at least 12 years, would be a very lengthy delay. And as a result, the court found that all costs that the utility claimed, with very few exceptions, were substantially caused by the government's delay. This analysis fails to consider whether or not the utility would have incurred these same costs in the first place. Simply labeling things— Professor, if this court concludes that the best contribution it can make to this series of cases is to set the rate for compensation, which of the, I guess, four alternatives can we tie to the contract best? Well, the rate that the government discussed at both in this case, in fact, all the cases you're going to hear today, is the rate that Judge Hewitt adopted in the PG&E case. You're talking about acceptance rate? Exactly, Your Honor. The contract sets for—at the time of contract award, or contract execution, the parties did not include in the contract a specific rate of acceptance. Now, during the contract— Are you talking about the 1991 rate? I'm talking about— That's the one that was adopted by PG&E. That's what you're discussing with me at this point? Well, that's correct, Your Honor, although I'm going back to the 1983 period when the contracts were actually formed. There was no rate at that point. The utilities requested during the administrative rulemaking process that DOE put in certain minimum mandatory requirements in the contract with regard to acceptance rate. DOE declined to do that. The rates that—the minimum mandatory obligations that the utilities wanted in through their comments on the proposed rule for the contract terms that was promulgated, some of them were asking that DOE include an obligation to accept fuel at a rate that would both meet the generation rate as in that law. DOE said no and did not include that. Instead, the parties included a contract mechanism that started— The ACR-APR, we're on that. The briefs are all over that. Now, get to the distinction between the 91 rate, the 87 rate, no MTUs at all or everything. Those are the four alternatives. The 91 rate is the one identified—the 91 period— That's adopted by PG&E.  The judge in PG&E. The period of time at which, pursuant to the contract mechanism, the utilities and the DOE were to begin to agree upon the rates at which DOE would accept fuel under this contract. Prior to that time, all documents were simply planning documents that were subject to change, subject to modification, given the long time frames that we're talking about in this contract, as well as the technical unknowns that— Well, that's a pretty low rate. That's a rate that is anticipatory of breach, if nothing else. It's farther from contract formation than the 87 rate. Why don't we go with the 87 rate? Well, as DOE repeatedly stated throughout the process, including the contract formation period, the rates at which—DOE didn't know at the time of formation what it was going to be able to do in 1998. This is a novel project. It's never been done anywhere in the world. It's technically very difficult. By 91, everybody knows it's not going to happen, right? Well, DOE certainly— Why isn't the 87 the one where everybody really thought it was still a workable goal to have the government take at least enough MTUs to prevent them having to build extra storage? Well, the 87 rate is based upon the idea of beginning acceptance at a repository. The contract does not require acceptance at a repository. The contract specifically provides that DOE may accept fuel beginning in 98, either at a repository or at an alternative facility, which would include the monitored retrievable storage facility that DOE contemplated in 1991. The rates in the 1991 ACR were based upon the idea—the concept of accepting fuel beginning in 98 at a monitored retrievable storage facility. Given that there's no contract requirement to begin acceptance at a repository— Well, this is a contract, Your Honor, that regardless of what rates you apply, the contract is going to be performed over dozens and dozens of years. The utilities continue to generate nuclear waste. The contract doesn't have an end date, per se. And so even at very aggressive rates, we're not talking about a contract that's going to be done in a few years and then everybody goes home. This is going to continue for dozens and dozens of years. But the 87 rate's closer to the contract formation, perhaps reflecting the intent better. It's not as low as 91. It's not as high as Judge Braden gave in the other case, the Sacramento case. However, Your Honor, as the Court of Claims held in the National Byproducts case, the ideas that were set forth in 87, 89, and in lots of planning documents—and we can find planning documents that have all kinds of rates—but those documents are just planning documents. They don't have a contract requirement. They were not incorporated into the contract. And at the time of formation, DOE expressly declined to obligate itself to satisfy its program plans. There's a problem with the DOE not committing itself. It didn't have to commit itself. These are pretty unilateral contracts. They take what you offer, period, because that's the only thing that there is. There's no alternative place to contract. So why isn't still the 87 a better than the 91 rate? That's really what the distinction is coming down to, isn't it? Well, why the 87, though? Why not the 89 or the 85? There are lots of different planning documents that we could pick amongst various ones. But the reason the 91 rate sets in place is, first of all, that was the date that the contract provided would be the date when the parties would begin agreeing upon these delivery commitment schedules. And second, the utilities did submit delivery commitment schedules and did not protest the rates in the 91 ACR at that point in time. They actually submitted DCSs for approval, and they were approved by the DOE. The trouble with 85 and 89 that you dismiss, that you throw out to confuse things a little bit, is that they are not based on the ACRAPR rate that we have in the contract. And our basic job is to tie ourselves to the contract, right? That is right. That's 87 or 91, and 87 seems to be the more reasonable. Although there's nothing in the contract order that mentions 87. There's nothing that mentions an 87 document. Mr. Lester, would you devote a little time to whether GTCC material should have been included, should not have been included? Of course, Your Honor. The issue there is fairly simple. The statute and the contract both define high-level radioactive waste as, one of the definitions is, other highly radioactive material that the NRC, consistent with existing law, determines by rule requires permanent isolation. The issue here is whether or not the NRC in 1989 defined GTCC waste as requiring permanent isolation. The rule that the utilities – and again, we have directly contrary decisions in this case in PG&E with Judge Marilyn Yankee deciding that GTCC is covered by the contract, that in fact the NRC converted it to high-level waste, Judge Hewitt holding the opposite way. If we read the 1989 rule and the comments that go with it, the NRC determined that it would require disposal of GTCC waste in a deep geological repository unless disposal as well has been explicitly approved by the NRC. 10 CFR 6155, right? That is – I'm sorry, I missed the site, Your Honor. 10 CFR 6155. That's right, and that was set forth in 53 Federal Register at page 17710. In the language that – Well, the Federal Register pulls back from that, apparently. Well, in that, that was the notice of the proposed rule, and then the final rule was at 54 Federal Register at 22579. In those Federal Register notices where the rule was promulgated, the NRC actually explained what it intended by that rule. I mean, it said that the commission in there, it said the commission is not now determining that the waste, even if highly radioactive, do in fact require criminal isolation. It specifically referenced the NWPA and determined that based on its finding that it was not requiring at that time that GTCC waste be permanently isolated, it was not finding that it constitutes HLW. Judge Hewitt looked at that and said it gave deference to the NRC's interpretation of its own rule and said that it had not, in fact, determined that it constitutes high-level waste. The issue is as simple as that. Certainly under the Seminole Rock rule of the Supreme Court, this court's repeated rules, Westbury, other cases, there is substantial deference provided to an agency interpreting its own regulations. And here, there have been repeated statements by NRC since that time, including in 2001, as we cite in our brief, that it did not intend, it did not convert GTCC inadvertently into HLW. Both the Sacramento and the Pacific case go the other way, right? That's exactly right. And for those reasons, the court should find that the trial for here erred and that the NRC did not, in fact, convert GTCC waste to HLW. Okay, thank you. Ms. Stetson?  Good morning, Your Honors, and may it please the Court. My name is Kate Stetson. I represent the Yankee Utilities. I want to begin with one comment about the real world, and then we can talk about the but-for world, because I think it's important for this court to begin its analysis, as the trial court did, understanding that the Yankee Utilities made their mitigation decisions not in some fictional universe, some but-for world, but in the real world, faced with real operational constraints and with what Judge Merrow concluded was a very reasonably realistic view of when DOE was likely to come and pick up their fuel. Now, as this court said in its per curia opinion in Bluebonnet, that's the starting point for the damages analysis. At that point, then, you ask the next question. What costs, if any, would have been incurred in the but-for world, in the world where DOE did come on time and begin picking up the fuel? And that is where the rate question comes in. Judge Rader, your question asked which of the four rates was most appropriate. And I think you're right to focus on— Can we tie to the contract? I'm not just looking for policy appropriateness. What can we tie to the contract? Yes. And the answer first is that there are four rates in this record that the trial court examined. One of them, you have observed, was a total outlier, and that's the 900 rate, the rate that was conceived of in 1991. It was one that was conditioned on two fictions that never came to pass, and it was testified to by two witnesses, was designed to limit liability in the, at that point, foregone conclusion of a breach. You have three other rates in the record, and Judge Merrow looked at each of them, and those rates were drawn from documents from 83, 84, and 88, the last of which was also the rate that the plaintiff's, the utility's expert adopted as his own. And that cluster of reasonable rates is the cluster that Judge Merrow examined the costs under. Now, tying it to the contract, Judge Rader, in this case means that you look at the purposes of the contract. And here we have substantial evidence in the record contemporaneous with the contract telling us what that purpose was. As Judge Merrow noted at pages 21, 23, 24 of his opinion, documents that emerged from the government in 1983, 84, 85, 86, all make clear that the critical purpose of this contract, the reason these utilities have paid, at this point, over $20 billion into this fund, was to relieve the utilities from the obligation of incurring additional at-reactor storage costs after January 31, 1998. That is the driver. That is the purpose of the contract. And that is the starting point for any assessment of what constitutes a reasonable rate. How do you distinguish the 87 from the 91 in terms of tying it to the contract? The most... The 91 is the last time the parties agreed, and they did agree. I would hesitate to say they agreed. The DCS process was, at that point, forced upon the utilities in the breach world. You have factual findings by the district court in this case that that 1991 document was not a credible rate. And if you look at the other rates... Why is it incredible? Why is it incredible? Because it was propounded. You had two witnesses, including a government witness, testify that it was propounded in the breach world for the purposes of limiting liability. And it was conditioned on two events that never came to pass. One of them, a congressional amendment of legislation. That never happened. It never has happened. So, again, looking at the record in this case, what you have is this outlier rate, the 900 MTU, which has been flatly rejected by this judge as a patently unreasonable rate. That rate wouldn't even keep up with half of the annual spent nuclear fuel production of the utilities. So Mr. Lester talks about this contract taking a long time to perform. That would take forever to perform because the government would be picking up rate at half the rate that the utilities were putting out. On the other hand, you have the cluster of reasonable rates that the parties put into this record, that the government put into this record as evidence of its early intentions, the intentions that can be tied most closely to this contract being around that time, 83, 84, 85, before thoughts of breach started creeping into the equation. You're defending now everything, which is what Judge Merrow awarded you, right? Well, to qualify that slightly, Judge Merrow didn't award us everything. Judge Merrow concluded, looking at each of those reasonable rates, that there were certain of our operating costs, the costs of maintaining our wet pools, that we would have incurred even in the non-breach order. But even the 1983 plan recognized that that was optimistic and not meant to be binding. It was aspirational. Your Honor, I don't think that the 1983 plan characterized those rates as optimistic. There's no agreement on this. The Department of Energy never accepted this. They at least accepted the 87. That tends to show the parties' agreement on what the contract meant and what they were undertaking as the contract progressed, and to suggest a reasonable mitigation rate. Let me suggest this about the Department never accepting it. Mr. Lester twice said that the Department had expressly rejected the notion of inserting a rate into the contract. The Department didn't expressly reject anything. It simply didn't decide. And there's a reason for that. This contract was on a very, very strict time schedule. It had to be promulgated. It had to be commented upon. It had to be generated. It had to be signed, all within a matter of weeks or a few months. So the fact that there is no binding agreement in this contract that was signed by every single one of these utilities in 1983 and under which the utilities have paid this $20 billion and counting dollars doesn't mean that that's why we're here. We're here to supply some context to the government's obligation that it reached. And the way that you supply that context best in these circumstances is by drawing all the way back to the signing of the contract, to those contemporaneous documents in 1983, 1984, 1985, and discerning the purpose of the contract. That's what Judge Merrill did at 21, 22, and 23 of his decision. And what he concluded is that the purpose of the contract was quite plain. The government set it itself to congressional committees, to the public when promulgating its fee analyses every year. And that, I think, is a critical piece of evidence. If you look at the government's fee analyses in 84, 85, and 86, these are annual reports that the statute requires the government to submit testing whether the amount of money that's coming into the nuclear waste fund is sufficient to carry out the project as the government envisioned it. And what you see in those reports for those three years is that the government envisioned the reasonable rate that the plaintiffs were putting forward in this case, that the utilities were saying was the most reasonable rate for the spent nuclear fuel to be picked up. So under any reasonable rate, and, again, reasonable is given its meaning by the purpose of the parties to the contract, to clear this spent nuclear fuel at a rate that would obviate additional at-reactor storage after January 31, 1998. To clear that fuel, the rate had to be pegged where the plaintiffs said it was in this case. Each of those three reasonable rates that Judge Merrow considered served that purpose. We recovered most, but not all, of the costs that we incurred because of that but-for world analysis. Let me turn briefly to the GTCC question. It is simple, Judge Gorey, but it's not simple in the way that Mr. Lester suggests. The contract defines... Which defines it as not simple. It's simple in exactly the opposite way. The contract defines high-level waste very specifically, and what it says is other highly radioactive material that the NRC, consistent with existing law, determines by rule requires permanent isolation. There is no dispute NRC has issued a rule. It requires deposit of GTCC in a geological repository, which Judge Merrow notes at page 86, equals permanent isolation. There is no dispute that NRC has... How does the commission's statement in the Federal Register detract from that or affect it? The answer is it does not, Judge Lurie. What NRC has done is to satisfy the contract's definition completely. The NRC has said GTCC waste requires permanent isolation, and I know there's an unless clause, but everybody agrees that right now in the current state of affairs there is no other option for GTCC waste except to permanently isolate it. The NRC's separate definition of high-level waste is irrelevant because the contract definition is what controls, and the contract definition doesn't key off of whatever NRC says high-level waste is, whatever NRC says GTCC is. It says waste that NRC determines requires permanent isolation. So once NRC made that determination, the contract definition is satisfied. That's why it's simple and clean, and the NRC's definition has nothing to do with that. How is allowing damages for re-racking consistent with this Court's opinion in the Indiana-Michigan case? It's consistent with Indiana-Michigan, Your Honor, because Indiana-Michigan hewed to the general rule for mitigation. Mitigation becomes appropriate when a party knows or has reason to know of an impending breach. The utility in Indiana-Michigan was seeking costs dating back to 89 to 94 range. We were seeking costs from the 92 and up range. There was ample testimony and documents produced not just by the government, but by these utilities. Maine Yankee and Connecticut Yankee were the two who re-racked, demonstrating their deep skepticism by the early 1990s, changing to even deeper skepticism by early 1993 when that first re-racking application for Maine Yankee went in. The re-racking application said on one of its very first pages, this re-racking is necessitated by DOE's failure to commit to picking up the spent fuel by 98. Under these facts, the trial court found that the mitigation efforts that these utilities engaged in in the mid-1990s were very reasonable and very appropriate. These are not the sorts of decisions that can be entered into lightly with a re-racking to begin the very next day. As the judge found based on testimony from the utility officials. The court in Indiana, Michigan tied it to that 94 date. We're talking now pre-94. Isn't there at least an apparent inconsistency here? No. The trial court in Indiana, Michigan, and then this court affirmed, concluded that that particular utility's decision in 1989 to re-rack, a decision that had been percolating since 1987, according to the trial court, was made in the ordinary course of business. This trial court concluded that there was sufficient, indeed ample, testimony and evidence from the witnesses affiliated with these utilities themselves showing that their decisions made in 93, 94, 95 to engage in the lengthy and cumbersome re-racking process were made in anticipation of that breach. That comports completely with Indiana, Michigan. And equally important, it comports with the general notion of mitigation precedence. That when you look at a party's mitigation, you ask yourself whether it was reasonable, whether the party at the time it acted had reason to know of the impending breach. And there was more than enough evidence in this record. Again, from documents produced by the government, from documents produced by studies these utilities conducted, and by the testimony that Judge Merrow found compelling of the utility witnesses themselves, all pointing to the conclusion that when these re-racking decisions were made, they were made because of the government's breach. If there are no further questions, thank you. Thank you.  Just a few quick points, Your Honor. With regard to the representations regarding the purposes of the contract, the trial court found not only that the purposes of the contract were to meet the standards that Yankee proposed, but that the Nuclear Waste Policy Act was too. However, in Section 10131 of the Nuclear Waste Policy Act, it specifically lays out the statute's purposes. Congress expressly published them. They were all for the public health and safety and to ensure that the utilities pay all of the costs of this program. They were not for the economic protection of the nuclear utilities. In the same way with the contract terms, we did not incorporate the test that the Yankees request into the contract. In fact, as the administrative rulemaking record shows, the sites of which are on page 8 of our initial brief, those were not incorporated. And finally, an integration clause in the contract would preclude adding these additional requirements, the integration clause that joined Appendix 249. In addition, with regard to the representation regarding fee reports, those reports also were issued in 91, 92, 93 at very different rates, and yet there were no effects on the finding of over-collections or under-collections. In fact, the rate matters very little to the overall program, which really focuses on the construction of the Yucca Mountain facility. With regard to the RERAC issue, the same info that in Indiana, Michigan this court found not good enough to constitute notice that the utility needed to mitigate is the same information that the court here found was good enough. In fact, the court relied, despite counsel's discussion of other factual evidence, the court relied on the 87 and 89 documents that the court in Indiana, Michigan also discussed, and the plaintiff there relied on. Although this is not a total breach case, the court's decisions with regard to anticipatory repudiation and how to get a firm statement with regard to whether you need to mitigate or not, whether it's going to be a breach, should be applicable here. And to have to go to the other party if you think there's not going to be performance and to seek assurances that there will be, and if there are not adequate assurances to be able to put forward on that basis. The Yankees didn't do that here. They just went and re-racked. Plus, regardless of that, there's no analysis by the trial court that would determine whether what would have happened had DOE actually met its contract obligations and whether the utilities here would have needed to re-rack. We would request the court reverse the trial process. In other words, your time is spent. And we won't discuss whether any further argument would have been a waste.